# EXHIBIT A

**Page 1**

```
       UNITED STATES BANKRUPTCY COURT
         MIDDLE DISTRICT OF FLORIDA


CYNTHIA JUSTICE, M.D.,
     Creditor,

vs.                    CASE NO.: 3:09-bk-07020-PMG

STEPHEN L. SCHULTZ,
     Debtor.
_____/


              TRANSCRIPT OF PROCEEDINGS

DATE TAKEN:        Wednesday, September 30, 2009
TIME:              10:59 a.m.
PLACE:             Federal Courthouse
                   300 North Hogan Street
                   First Floor, Suite I-200
                   Jacksonville, Florida  32202
BEFORE:            Jill Kelso, Trial Attorney
                   United States Trustee Program

    This cause came on to be heard at the time and
place aforesaid, when and where the following
proceedings were reported by:

           Rebecca Noel, Court Reporter
        Anderson Reporting Services, Inc.
          233 East Bay Street, Suite 926
           Jacksonville, Florida  32202




              ANDERSON REPORTING SERVICES, INC.
                       (904) 358-0112
```

**Page 2**

```
                   A P P E A R A N C E S

              APPEARANCE FOR THE CREDITOR

              TIFFINY D. SAFI, Esquire
               Cooper, Ridge & Safi, P.A.
             136 East Bay Street, Suite 301
              Jacksonville, Florida  32202


              APPEARANCE FOR THE DEBTOR

              WENDELL FINNER, Esquire
                Wendell Finner, P.A.
             340 Third Avenue South, Suite A
             Jacksonville Beach, Florida  32250


                         - - -




              ANDERSON REPORTING SERVICES, INC.
                       (904) 358-0112
```

**Page 3**

1    ---
2                    PROCEEDINGS
3    September 30, 2009            10:59 a.m.
4    ---
5        **MS. KELSO:** Okay. We are moving on to
6    the Section 341 Meeting of Creditors in the
7    case of Stephen L. Schultz, S-t-e-p-h-e-n L.
8    Schultz, S-c-h-u-l-t-z, Case No. 09-07020,
9    pending in front of Judge Glenn, in the Middle
10   District of Florida Bankruptcy Court,
11   Jacksonville Division. It is September 30th,
12   2009 at 11:00 a.m.
13       May I please have appearances for the
14   debtor?
15       **MR. FINNER:** Good morning, Wendell
16   Finner, I represent Mr. Schultz, who is present
17   and seated beside me.
18       **MS. KELSO:** Okay. And Mr. Schultz, do
19   you have identification with you?
20       **MR. SCHULTZ:** Yes, ma'am, I do (tenders
21   documents).
22       **MS. KELSO:** Okay, great. Let me check, I
23   am looking at Mr. Schultz's social security
24   card, which matches the last four digits that
25   we have on the bankruptcy petition in the case,

**Page 4**

1    as well as his driver's license, and it is,
2    indeed, Mr. Schultz who is here today.
3        Will you please raise your right hand and
4    be sworn?
5        **MR. SCHULTZ:** (Complies.)
6        **MS. KELSO:** Do you swear or affirm that
7    you'll tell the truth, the whole truth and
8    nothing but the truth?
9        **MR. SCHULTZ:** I do.
10       **MS. KELSO:** Thank you.
11       Mr. Schultz, my name is Jill Kelso. I'm
12   a trial attorney for the United States
13   Trustee's Program. I'll be conducting the
14   Section 341 Meeting of Creditors today, which
15   is, as you can see, being recorded, so I ask
16   that only one person speak at a time so that we
17   can get an accurate recording, and, as you
18   know, you are under oath during the exam.
19       Our office is responsible for overseeing
20   and monitoring Chapter 11 bankruptcy cases,
21   which is why we're conducting the meeting here
22   today.
23       And it looks like we do have a creditor
24   present. Who is that?
25       **MS. SAFI:** Tiffiny Safi, on behalf of

Page 5

1  Dr. Cynthia Justice.
2       MS. KELSO: Okay. I am going to go ahead
3  and start by asking some questions about what
4  you filed in the bankruptcy case, your petition
5  and your bankruptcy schedules. I know that you
6  had an initial debtor interview with Mr. Gentry
7  of our office and provided certain documents to
8  me this morning, that I haven't really had a
9  chance to look at, but I'm going to go ahead
10 and start.
11          EXAMINATION
12 BY MS. KELSO:
13 Q  You indicated on your bankruptcy petition
14 that your address is 445 North Ocean Grande Avenue,
15 Unit 102, in Ponte Vedra Beach. Do you own this
16 premises?
17 A  No, ma'am.
18 Q  Do you rent this premises?
19 A  Yes, ma'am.
20 Q  Okay. How long have you been at that
21 address?
22 A  Approximately six months.
23 Q  Okay. And then you also list a mailing
24 address, which is 830-13 A1A North, No. 305, in
25 Ponte Vedra. What is at that location?

Page 6

1  A  That a UPS store, where I have my
2  mailbox, where I receive all my correspondence.
3  Q  Okay. In looking through -- obviously,
4  you filed your bankruptcy. It looks like you filed
5  on August 21st of 2009. What was the -- what
6  prompted you to file for bankruptcy?
7  A  Well, my automobile and other items were
8  being repossessed and, also, my wages were being
9  garnished and, basically, I have debts that exceed
10 my ability to pay, so I'm seeking refuge in
11 bankruptcy court.
12 Q  What other items were repossessed? You
13 said your automobile and other items.
14 A  Well, my automobile was repossessed.
15     MR. SCHULTZ: And I believe there was a
16 lien placed on some of my other items; is that
17 correct?
18     MR. FINNER: One of Mr. Schultz's
19 creditors obtained a judgment domesticated in
20 Florida this summer. Pursuant to that
21 judgment, they executed on his motor vehicle
22 and also garnished his bank account.
23 BY MS. KELSO:
24 Q  Okay. So when was the judgment obtained,
25 do you know?

Page 7

1  A  I don't know that as I sit here, no,
2  ma'am.
3  Q  Okay. So was it one judgment or multiple
4  judgments?
5  A  I believe it was --
6     MR. SCHULTZ: Was it one judgment?
7  BY MS. KELSO:
8  Q  Who's the judgment holder?
9  A  I believe it's Dr. Cynthia Justice.
10 Q  And what is the judgment for?
11    MR. FINNER: It's in the approximate
12 amount of a quarter million dollars.
13 BY MS. KELSO:
14 Q  What is it for? Why was the judgment
15 obtained?
16 A  I signed a promissory note during our
17 divorce, in the amount of $250,000, to Dr. Justice.
18 Q  Okay.
19 A  She's my former spouse.
20 Q  So you signed a promissory note during
21 the divorce proceeding?
22 A  Yes, ma'am.
23 Q  So was it related to the distribution of
24 property?
25 A  No, ma'am. It was strictly a promissory

Page 8

1  note that I signed. It was not a distribution of
2  property.
3  Q  Okay. Why did you sign the promissory
4  note?
5  A  She alleged that I owed her money and it
6  was an effort on my part to facilitate the divorce
7  at the time and to expedite the divorce proceedings.
8  Q  Okay. We might get a little bit more
9  into that shortly, but I -- so, essentially, it was
10 because -- you filed a bankruptcy. Were there any
11 other disputes with any other creditors of yours,
12 besides the judgment, that prompted the bankruptcy
13 filing?
14 A  Disputes, could you clarify, when you say
15 "disputes"? I'm not sure I understand.
16 Q  Was anyone else asking for you to pay
17 them money?
18 A  Yes. I had been receiving some dunning
19 notices from other creditors.
20 Q  Some what notices?
21 A  Dunning, or I'd been getting demand
22 letters from other creditors, yes, ma'am.
23 Q  From whom were you receiving demand
24 letters?
25 A  I don't know exactly who, but I know it

Page 9

1  was some of the -- like the credit card companies
2  that I listed.
3    Q  Okay. So the judgment that you got, that
4  was entered against you and then being executed upon
5  your motor vehicle, in the execution they also
6  garnished your bank account and then you also
7  received demand letters from credit card companies.
8  Was there any other factor that prompted you to file
9  for bankruptcy?
10   A  Just my inability to pay on my promissory
11  note and the credit cards.
12   Q  Okay. All right. In looking at your
13  bankruptcy schedules, it looks like you don't have
14  anything on Schedule A. Do you own any real
15  property?
16   A  No, ma'am.
17   Q  Okay. Obviously, this is an individual
18  case and these are your bankruptcy schedules. Did
19  you review the bankruptcy schedules before they were
20  filed?
21   A  Yes, ma'am.
22   Q  And was everything in the bankruptcy
23  schedules true and correct --
24   A  To the best of my knowledge.
25   Q  -- at the time they were filed?

Page 10

1   A  Yes, ma'am.
2   Q  So do you affirm that the schedules are
3  accurate?
4   A  Yes, ma'am.
5   Q  Okay. So you don't own any real
6  property. Have you owned real property in the last
7  two years?
8   A  No, ma'am.
9   Q  Okay. It shows on your Schedule B, which
10  is your personal property, that you have bank
11  accounts at Bank of America, both a checking and a
12  MyAccess checking. Those accounts, have they been
13  closed?
14   A  Yes, ma'am, they have been closed.
15   Q  Okay. It looks like our office has proof
16  that they were closed. And have you opened
17  debtor-in-possession banking accounts yet?
18   A  Yes, ma'am, I have, and that's what my
19  attorney provided you this morning.
20   Q  Okay. So where are those accounts?
21   A  At Bank of America.
22   Q  Okay. All right. I'm looking at the
23  documents you gave me this morning. It looks like
24  you opened up what is called an operating account.
25  Is that a checking account --

Page 11

1   A  Yes, ma'am.
2   Q  -- at Bank of America?
3   A  Yes, ma'am.
4   Q  Okay. All right. Are there any other
5  bank accounts that you had as of the petition date
6  that are not on here?
7   A  No, ma'am.
8   Q  Okay. It shows on here a security
9  deposit with Ponte Vedra Real Estate. What is that
10  for?
11   A  That's a security deposit for the rental
12  unit that I live in.
13   Q  Okay. And what is the term of your
14  lease?
15   A  The term that I'm under now is a seven
16  month term. It expires at the end of October.
17   Q  And do you intend to remain at that
18  location?
19   A  Yes, ma'am.
20   Q  So will you be signing a new lease?
21   A  I have signed a new lease for a 12 month
22  period, beginning November 1.
23   Q  So it will be November 1, 2009 to October
24  31st, 2010?
25   A  Yes, ma'am.

Page 12

1   Q  Okay. And what is the monthly rent?
2   A  It's currently $1800. The new lease is
3  at $1500.
4   Q  So until the end of October of 2009 it's
5  1800 and then for this 12 month term it's 1500?
6   A  Yes, ma'am.
7   Q  And that's a month; correct?
8   A  Yes, ma'am.
9   Q  Okay. And then you also have a security
10  deposit for Florida Power & Light. Is that related
11  to your electricity at your current location?
12   A  Yes, ma'am, it is.
13   Q  Okay. And then you have some various
14  household goods and furnishings. You have them
15  valued at $6,670. How did you arrive at that value?
16   A  Based on fair market value. I did some
17  research and arrived at that figure accordingly.
18   Q  And what did you look at when you did
19  your research?
20   A  Well, everything is obviously used. I
21  went to the Internet and did some homework on what
22  those items would bring.
23   Q  What sites did you access?
24   A  Well, I know I went to Craig's List,
25  which seemed to have a pretty good cross-section.

Page 13

1  Q  Okay. Then you also have your clothing
2  and then you have firearms, sport and other
3  equipment. You have six guns. What types of guns
4  are they?
5  A  Those are shotguns that I inherited.
6  Let's see, four shotguns and two rifles that I've
7  inherited. They're probably all 30 or 40 years old.
8  Q  From whom did you inherit them?
9  A  From my mom, when she passed away, and
10 from my uncle, when he passed away, 20 or 30 years
11 ago; 30 years ago.
12 Q  When did your mom pass away?
13 A  She passed away in 1991.
14 Q  Okay. You have snow skis, poles, boots,
15 that all, obviously, would relate to the ski
16 equipment; is that correct?
17 A  Yes, ma'am.
18 Q  Okay. Your life insurance policies, are
19 those -- it doesn't -- you don't have them as
20 showing any value. Is there any cash or value in
21 your policies?
22 A  There's no cash or render value, no,
23 ma'am.
24 Q  So then they're just term policies?
25 A  Correct.

Page 14

1  Q  Okay. You also list, at No. 13, stock in
2  Integrated Global Solutions, but you valued it at
3  zero. What is that company?
4  A  It's a Texas sub S corporation. I'm the
5  sole stockholder and it's a company in good
6  standing, but I have no activity in that company
7  right now. We're not doing any business at this
8  point in time.
9  Q  Does the company own any assets?
10 A  No, ma'am.
11 Q  It's currently active?
12 A  Yes, ma'am.
13 Q  Okay. You have accounts receivable for
14 sale of auto to Lucretia, L-u-c-r-e-t-i-a, A.
15 Emmert, $7,000 is owed, and then you value your
16 interest at 3700. Can you explain that to me?
17 A  Yes, ma'am. That automobile belonged to
18 my father. When he passed away, about two years
19 ago, Ms. Emmert had basically been taking care of
20 family members, she was a caregiver, and nobody in
21 the family wanted that car or anything to do with
22 it, so we basically sold that car to her. The
23 payout on that is $150 a month. That was really our
24 way of saying thank you for taking care of family
25 members.

Page 15

1  Q  What kind of car was it?
2  A  I believe it's approximately a 2001
3  Jaguar sedan.
4  Q  Okay. So then she remains -- she still
5  owes $7,000?
6  A  Less what she's paid over the last year
7  or so.
8  Q  Okay.
9  A  I mean what she's paid since that time,
10 so she owes approximately 7,000, yes, ma'am.
11 Q  So, but you value your interest in the
12 property at 3700. Who has the other interest in the
13 property?
14 A  Well, again, the resale value of that car
15 really is probably about $3500 and so that's why we
16 put that dollar amount on the schedule.
17 Q  Does anybody else have entitlement to the
18 monies that she's paying on a monthly basis or do
19 they flow directly to you?
20 A  No and yes; no one else has any interest
21 in the car and the payments flow directly to me.
22 Q  Okay. Were you the sole beneficiary of
23 your dad's estate?
24 A  No, ma'am, my sister was also a
25 beneficiary of the estate.

Page 16

1  Q  But she doesn't have an interest in the
2  money flowing from the vehicle?
3  A  She is deceased. She has since deceased.
4  Q  Okay. All right. You also list that
5  you're the beneficiary of a trust, Frank L. Schultz
6  irrevocable trust, established in February of 1993.
7  It says the value is not known. What assets are in
8  that trust?
9  A  My father's home. His wife has a life
10 estate in that home.
11 Q  Is there anything else in the trust?
12 A  Yes, ma'am. There are some cash and
13 securities in the trust as well, and that's all
14 managed by a trustee.
15 Q  And who is the trustee?
16 A  It's the Border Capital Bank.
17 Q  Border?
18 A  Yes, it's B-o-r-d-e-r.
19 Q  Capital Bank?
20 A  Capital Bank, trust department.
21 Q  And do you have a copy of the trust
22 agreement?
23 A  I do.
24 Q  Okay. We might need to get that and I'll
25 have -- just so you know, another trial attorney --

Page 17

1  we have four trial attorneys in our office. We
2  don't send them all, we have one person come, try to
3  come to Jacksonville, because our office is in
4  Orlando, and this is Elena Escamilla's case, but
5  they may -- unless we've already gotten it, it
6  doesn't look like we have, we'll want to get the
7  trust agreement.
8         MR. FINNER: We advised Mr. Gentry, and I
9  did put a call into Ms. Escamilla, even though
10 she was too busy for us to talk at any length,
11 but the trust agreements do reflect personal
12 and private and confidential information, not
13 only of Mr. Schultz, but of other people that
14 are involved in the trust and so we would want
15 to produce that document under appropriate
16 conditions, so that would not be available, for
17 example --
18        MS. KELSO: Well, our office -- I mean,
19 if you need to, you're certainly welcome to
20 present any confidentiality agreement you feel
21 is appropriate; however, our office doesn't
22 provide documents out, but certainly, if you
23 feel that that's appropriate, Ms. Escamilla
24 will take a look at --
25        MR. FINNER: I'll talk to her about it.

Page 18

1  Mr. Gentry did advise us that it would be
2  subject to a voyeur request, if it was
3  produced, where they would have the appropriate
4  protection.
5         MS. KELSO: Right. So you can -- you
6  know, if you're interested in drafting some
7  kind of confidentiality agreement, that -- you
8  know, we'll certainly look at that and work
9  with you on it.
10 BY MS. KELSO:
11    Q  The same question on personal property,
12 No. 20. You also listed a testamentary trust
13 established by the will and testament of Frank
14 Schultz. What assets are in that trust?
15    A  I need to clarify. The home is in the
16 testamentary trust.
17    Q  Okay.
18    A  The first trust you asked me about, that
19 is -- I know that as the -- it's an irrevocable life
20 insurance trust, that's how I know the first trust,
21 that's how I identify it, so I was confused, I
22 apologize.
23    Q  So the first one is an irrevocable life
24 insurance trust?
25    A  Correct.

Page 19

1     Q  So the assets in there are actually life
2  insurance?
3     A  Proceeds from a life insurance policy on
4  my father. Upon his demise that was paid out to the
5  trust, which is managed by the Border Capital Bank,
6  trust department.
7     Q  And who are the beneficiaries of the
8  trust?
9     A  I am.
10    Q  The sole beneficiary?
11    A  Yes, at this time. My sister was also a
12 beneficiary, but she is deceased.
13    Q  Okay. And then --
14    A  And in that is just, to the best of my
15 knowledge, is just cash and securities.
16    Q  Okay. In that -- the irrevocable --
17    A  In the ILIT, yes, ma'am.
18    Q  Okay.
19    A  The irrevocable life insurance trust.
20    Q  Okay. And then for this other one, the
21 testamentary trust --
22    A  Right.
23    Q  -- that has the actual -- the home,
24 subject to your dad's wife's life estate?
25    A  Correct.

Page 20

1     Q  And then is there anything else in that
2  one?
3     A  Cash and securities.
4     Q  So they both have some cash and
5  securities?
6     A  Yes, ma'am.
7     Q  Anything else?
8     A  Not to the best of my knowledge, no,
9  ma'am.
10    Q  And who is the trustee of the
11 testamentary trust?
12    A  The same trust department; Border Capital
13 Bank, trust department.
14    Q  And then who are the beneficiaries?
15    A  I am.
16    Q  The sole?
17    A  Yes, ma'am.
18    Q  Okay. Do you have a vehicle?
19    A  I do, yes, ma'am.
20    Q  I don't see that on here. I might have
21 missed it or did we not -- I'm sorry, we didn't get
22 there yet, that was the next thing. You have a 2007
23 Chevrolet Tahoe. Are there any liens on it?
24    A  No, ma'am.
25        MR. FINNER: Technically there is

Page 21

1    currently the judgment and lien of Dr. Justice
2    on it.
3        MS. KELSO: Okay.
4        THE WITNESS: Let me rephrase that, no
5    lien at --
6  BY MS. KELSO:
7    Q   Like, when you bought it you didn't have
8  it financed or anything?
9    A   It's paid off.
10   Q   Okay. And then you show on here office
11 equipment. What is the office equipment, where is
12 that?
13   A   Well, I have a home office. One of my
14 bedrooms is where I work.
15   Q   And what type of work do you do there?
16   A   I'm in sales.
17   Q   What do you sell?
18   A   Everything. I've done real estate, for a
19 number of years, and debit card sales.
20   Q   And do you continue to do real estate
21 sales and debit card sales?
22   A   Not at this time. At this time I am
23 looking for employment.
24   Q   Okay. Is there anybody else that
25 contributes to the rent at your home?

Page 22

1    A   No, ma'am.
2    Q   And on Schedule D, where you show your
3  secured claims, you do show Ms. Cynthia Justice, and
4  that's your former spouse, with a judgment. So the
5  judgment was actually in the amount of $250,000, or
6  do you know?
7    A   I believe it was that amount plus an
8  additional amount, but that's the principal amount
9  due. I believe there was some penalty that was
10 included in that.
11   Q   Okay. And then you have your security
12 deposit on here and then you have the Schultz
13 irrevocable trust. Was this related to your
14 father's trust?
15   A   Yes, ma'am.
16   Q   And so why do you have them as a secured
17 creditor?
18   A   The trust -- well, I had no funds with
19 which to retain counsel for this bankruptcy, so the
20 trust essentially loaned me the money to acquire
21 counsel and I'm paying the trust back $500 a month,
22 so they are a secured creditor.
23   Q   Did they take a security interest in any
24 of your property?
25   A   Well, I have a promissory note with them.

Page 23

1        MR. FINNER: We believe that they likely
2    have a possessory security interest in the
3    trust assets or in Mr. Schultz's beneficial
4    interest in this trust.
5  BY MS. KELSO:
6    Q   Okay. So are you current on all of your
7  obligations for taxes?
8    A   Yes, ma'am.
9    Q   You have, on Schedule F, a company called
10 Asset Acceptance. They claim that you owe them
11 $5,700 and change from various collections. What
12 does that mean?
13       THE WITNESS: Can I take a look at that?
14       MR. FINNER: (Tenders document.)
15       THE WITNESS: One moment please. Well,
16   to the best of my knowledge, my understanding
17   is that Asset Acceptance may have aggregated
18   several other credit cards into the amounts
19   that are shown here.
20 BY MS. KELSO:
21   Q   Okay. It looks like they're also listing
22 an $11,800 and change?
23   A   Yes, ma'am.
24   Q   So do you think, were they trying to
25 collect on outstanding credit card debt?

Page 24

1    A   That's my belief, yes, ma'am.
2        MR. FINNER: There's actually been a
3    proof of claim filed by an entity that
4    Mr. Schultz does not recognize, which may very
5    well be a retransferred credit card debt.
6    There's no telling whether it came via Asset
7    Acceptance or in some other vector.
8  BY MS. KELSO:
9    Q   Do you have any information about the
10 underlying credit cards that they were trying to
11 collect?
12   A   I do, yes, ma'am.
13   Q   How many were there?
14   A   Well, I don't have that information with
15 me at this time, but I believe it was two, possibly
16 three different credit cards.
17   Q   And when were those charges made?
18   A   I don't have that right in front of me.
19 I can give you my best recollection, if you would
20 like.
21   Q   That's fine.
22   A   I would say around early 2000, 2001.
23   Q   Okay. Have those credit cards been
24 closed?
25   A   Yes, ma'am.

Page 25

1  Q  Do you know for what they were used, what
2  the charges were for?
3  A  Not as I sit here, since I say it's been
4  seven or eight years ago.
5  Q  Okay. So there were various purchases
6  made then?
7  A  Yes, ma'am, correct.
8  Q  Okay. And then you have Capital One on
9  here and Capital One Services, various credit card
10 purchases?
11 A  Yes, ma'am.
12 Q  With the first Capital One, when were
13 those purchases made?
14 A  Again, approximately the same time
15 period, early 2000, 2001.
16 Q  Is that the same for the second Capital
17 One?
18 A  Yes, ma'am, to the best of my knowledge.
19 Q  Do you recall what was purchased?
20 A  Again, just various items.
21 Q  Okay. And are those accounts closed?
22 A  Yes, ma'am, they are.
23 Q  On the next page you have Cardinal
24 Recovery Group, Chase, Citicard, Primus Financial
25 Services and Providian, those are various credit

Page 26

1  cards?
2  A  I know that Chase, Citi and Providian are
3  credit cards. I'm not sure what Cardinal and Primus
4  are.
5  Q  And when were the Chase, Citi and
6  Providian, was that the same 2000 to 2001 time
7  period?
8  A  To the best of my knowledge, yes, ma'am.
9  Q  Was there something in particular
10 happening during that time period that prompted the
11 charges?
12 A  Well, I was in the real estate business
13 in Austin, Texas at the dotcom crash and I think I
14 was using my credit cards to live on at that time.
15 Q  So during 2000, 20001 or thereabouts.
16 Okay. So you're not sure about Cardinal or Primus?
17 A  That's correct.
18 Q  Okay. Same question, Reynolds &
19 Associates, do you know what that is?
20 A  No, ma'am, I do not.
21 Q  All right. You have your lease on
22 Schedule G. Okay. Looking at your statement of
23 financial affairs, it shows that your income for
24 2008 was $8400 and for 2007 it was 4800?
25 A  Yes, ma'am.

Page 27

1  Q  What were the sources of the income?
2  A  The 8458, I had employment.
3  Q  What employment?
4  A  I worked for a company called Transfirst,
5  T-r-a-n-s-f-i-r-s-t, and they were in the debit card
6  business.
7  Q  When did you last work for them?
8  A  I ceased employment with them in
9  approximately May of 2008.
10 Q  Okay. And the 2007 amount?
11 A  2007, that was some miscellaneous income
12 that I earned from my prior debit card employer, and
13 that was Global Cash Card.
14 Q  When you say "debit card," what does that
15 mean, debit card employer, what did you actually do?
16 A  I sold debit cards to companies, that
17 they used for payroll purposes.
18 Q  Okay. Have you had any income in 2009?
19 A  No, ma'am.
20 Q  So how are you supporting your -- how are
21 you paying your monthly rent?
22 A  Yes, ma'am. I have a monthly
23 distribution from the trust department that I'm
24 using to pay my monthly rent and my monthly living
25 expenses.

Page 28

1  Q  How much is your monthly distribution?
2  A  Well, it has been 4500 month. It is now
3  4,000 a month, as the bank is withholding 500 a
4  month to repay the loan that they extended me for my
5  legal counsel.
6  Q  Okay. Well, I mean, technically that
7  would be income too. It should have been included
8  on this, in this answer.
9  MR. FINNER: Respectfully, Ms. Kelso, it
10 is not income. It is a conversion of an asset
11 from one form to another. We did provide an
12 explanatory note to that effect in the
13 schedules.
14 MS. KELSO: Okay. Well, I don't see a
15 note. There's no note that I see in response
16 to Question 1.
17 MR. FINNER: We felt that including it as
18 a note, identifying specifically what it was,
19 would be more helpful to creditors and --
20 MS. KELSO: Was this filed with the
21 court?
22 MR. FINNER: Yes, ma'am.
23 MS. KELSO: Okay. I don't have it on
24 mine, I don't know why, but I'll have to look
25 into that issue, or our office will.

Page 29

1  THE WITNESS: All right. Thank you.
2  MS. SAFI: Ms. Kelso, the addendum did
3  come with our schedule --
4  MS. KELSO: It did?
5  MS. SAFI: -- that I pulled off of the
6  PACER Web site, so just to let you know.
7  MS. KELSO: I don't know why I don't have
8  it. Okay. Thank you.
9  MS. SAFI: You're welcome.
10 BY MS. KELSO:
11 Q  Okay. Going on, it looks like you have
12 listed the lawsuit with Ms. Justice and that -- it
13 doesn't have the status or disposition of that on
14 here, but that has been reduced to judgment; right?
15 She actually -- there's actually been a judgment in
16 that case?
17 MR. FINNER: There was a foreign judgment
18 domesticated in the state of Florida. We do
19 not actually have any copies of the underlying
20 judgment, but ordinarily the courts don't let
21 you do that, unless there's a judgment from
22 somewhere.
23 MS. KELSO: So you never received a copy
24 of any other judgment from any other state?
25 MR. FINNER: No.

Page 30

1  MS. KELSO: I'm asking the debtor, I'm
2  sorry.
3  BY MS. KELSO:
4  Q  Mr. Schultz, did you ever receive a
5  judgment from any other state? I mean, did you
6  actually ever receive the judgment?
7  A  As I sit here right now, I do not recall.
8  Q  Okay. Where was the underlying
9  proceeding pending?
10 A  Denver, Colorado.
11 Q  Okay. And then you also listed on here,
12 this looks to be, the property that you were
13 explaining was garnished and it was $849.60 plus
14 $100 in banking fees?
15 A  Yes, ma'am.
16 Q  And that was garnished based on the
17 domestication, or execution on the Colorado
18 judgment?
19 A  Yes, ma'am.
20 Q  Has that bank account been closed?
21 A  Yes, ma'am.
22 Q  And the $849.60 plus the $100 is the
23 entire amount that was ever garnished?
24 A  Yes, ma'am.
25 MR. FINNER: There may be a typo there.

Page 31

1  I believe the amount was 749.60 plus $100. The
2  entire $849.60 amount has been returned to the
3  debtor by Dr. Justice, after the filing of this
4  case.
5  BY MS. KELSO:
6  Q  Okay. It was garnished on June 16th of
7  this year?
8  A  That sounds correct.
9  Q  All right. It shows on your statement of
10 financial affairs that you paid -- I'm assuming, I
11 need to ask you. Who paid Mr. Finner for the legal
12 fees in this case?
13 A  I am, from the loan that I received from
14 Border Capital Bank.
15 Q  Because on here it shows that you paid
16 $300 and then 25, I guess it's 25, I don't know,
17 either the comma is in the wrong place or --
18 MR. FINNER: The comma is in the wrong
19 place.
20 BY MS. KELSO:
21 Q  So you paid him -- how much did you pay
22 him?
23 A  One moment please. Well, let's see, I
24 have on 7/15 I paid 300, on 8/03 of this year 2,500
25 and on 8/21 of this year 20,000.

Page 32

1  Q  Have there been any other payments?
2  A  No, ma'am.
3  Q  So you paid him a total of $22,800?
4  A  $22,800, yes, ma'am.
5  Q  All right. I'm going to give the
6  documents you gave to me today to the analyst and
7  give my notes to Ms. Escamilla, but we're going
8  to -- do you have a renter's insurance policy?
9  A  Yes, ma'am. I believe that is included
10 in what I provided you today.
11 Q  Okay.
12 A  Flood insurance, as well.
13 Q  Does it also cover fire and theft?
14 A  Yes, ma'am.
15 Q  Okay. And then you gave me the opening
16 account information. We'll want to get the trust
17 agreement and then you have to work out the terms of
18 the confidentiality agreement. You can work with
19 them as well. You have to file monthly operating
20 reports while you're in bankruptcy. Given that you
21 filed on August 21st, your first report will be due
22 September 20th, or it was due, I don't know if it
23 was filed or not.
24 MR. FINNER: We discussed that with
25 Mr. Gentry. He's okay with our including the

### Page 33

1  end of August in the September report when it
2  is filed.
3  **BY MS. KELSO:**
4  Q  So that all will be filed on October 20th
5  or by October 20th?
6  A  Yes, ma'am.
7  Q  And then you'll be paying quarterly fees.
8  The first payment will be due on October 31st.
9  A  Yes, ma'am.
10  Q  And it will be based on the disbursements
11  that you pay; your rent, whatever you pay, actually,
12  which will be delineated in your monthly operating
13  report.
14  MS. KELSO: I'm going to go ahead and let
15  Ms. -- Safi?
16  MS. SAFI: Safi.
17  MS. KELSO: -- Safi ask questions.
18  THE WITNESS: Thank you.
19  MS. KELSO: Sure.
20  MS. SAFI: Thank you, Ms. Kelso.
21  **EXAMINATION**
22  **BY MS. SAFI:**
23  Q  Mr. Schultz, I'm Tiffiny Safi. I'm an
24  attorney for Dr. Cynthia Justice.
25  A  How do you spell your last name, please?

### Page 34

1  Q  It's S, as in Sam, a, f, as in Frank, i.
2  A  Thank you.
3  Q  I'm with the law firm of Cooper, Ridge &
4  Safi, here in Jacksonville.
5  A  Yes, ma'am.
6  Q  You just stated that you had not received
7  a copy of the judgment that was entered in Denver,
8  Colorado; is that correct? Or you don't recall
9  receiving it?
10  A  I think what I said is I -- I'm not
11  certain, I do not recall if I received that.
12  Q  Okay. Were you served with a summons and
13  complaint here in Florida in the Justice v. Schultz
14  matter?
15  A  A summons and complaint?
16  Q  Did a process server serve you with
17  papers for a Duval County court proceeding?
18  A  I do not recall. I would have to check
19  my file to determine that.
20  Q  Have you been served in the last year by
21  a personal process server with court papers?
22  A  I do not recall having been served by a
23  process server.
24  Q  Were you served by an officer from the
25  sheriff's department?

### Page 35

1  A  Well, the sheriff did come to my door the
2  day that they collected the vehicle, but that -- is
3  that what you're referring to?
4  Q  No. I was actually referring to someone
5  personally handing you court papers that would have
6  something indicating that Ms. Justice was suing you,
7  Dr. Justice was suing you here in Duval County?
8  A  Not to the best of my knowledge.
9  Q  Okay.
10  A  As I sit here today, I do not recall
11  having been served.
12  Q  Okay. You stated earlier that your
13  father passed away two years ago?
14  A  I don't recall stating that. My father
15  passed away in approximately April of 2007.
16  Q  Okay. Were you the direct beneficiary of
17  any property from his estate?
18  MR. FINNER: I'm going to object on the
19  grounds that the question is ambiguous and it
20  may include a legal term. Of course,
21  Mr. Schultz is not a lawyer. If you understand
22  the question and you can answer it, go ahead
23  and do so.
24  THE WITNESS: Would you repeat the
25  question for me please, Ms. Safi?

### Page 36

1  MS. SAFI: Would you read the question
2  back, Becky?
3  (The question last-above referred to was
4  read by the reporter.)
5  THE WITNESS: I'm not quite sure what
6  that means.
7  **BY MS. SAFI:**
8  Q  Let me clarify.
9  A  Please.
10  Q  The 2001 Jaguar that you sold to
11  Lucretia -- and I can't remember her last name.
12  A  Emmert.
13  Q  Yes, sir -- was that property directly
14  inherited from your father's estate by you?
15  MR. FINNER: Same objection. You may
16  answer.
17  THE WITNESS: No, it was not.
18  **BY MS. SAFI:**
19  Q  Okay. How did you end up with the
20  possessory interest in the 2001 Jaguar?
21  A  Through my sister's demise.
22  Q  So your sister inherited the 2001 Jaguar?
23  A  She bought the car from the estate.
24  Q  Okay.
25  A  When she died, I ended up with it and

### Page 37

1  essentially sold it to Ms. Emmert.
2    Q  Okay.
3    A  Nobody wanted the car.
4    Q  I understand. And I'm sorry for both of
5  your losses.
6    A  I appreciate that. It was a bad year.
7    Q  I can understand. Were you the
8  beneficiary of any life insurance policy proceeds
9  held by your father?
10       MR. FINNER: Same objection. You may
11     answer.
12       THE WITNESS: Well, the trust, as I
13     understand it, the trust was the beneficiary of
14     the proceeds.
15  BY MS. SAFI:
16    Q  Okay.
17    A  The life insurance trust. I may be
18  mistaken, but that's my understanding.
19    Q  Other than the irrevocable life insurance
20  trust, did you receive a check from a life insurance
21  company at the passing of your father?
22    A  No, I do not believe I did. I do not
23  recall receiving a check --
24    Q  Do you know how --
25    A  -- of that nature.

### Page 38

1    Q  Excuse me. Okay.
2       Do you know how much or the amount of the
3  life insurance proceeds that funded the irrevocable
4  trust?
5       MR. FINNER: Same objection. You may
6     answer.
7       THE WITNESS: It was a $400,000 life
8     insurance policy.
9  BY MS. SAFI:
10    Q  Are you aware of a $250,000 life
11  insurance policy held by your father?
12    A  No, ma'am.
13    Q  No. Okay.
14       And again, I'm sorry to be asking these
15  questions, because I understand that it's difficult
16  to talk about. I understand that your sister passed
17  away in 2008, and other than the 2001 Jaguar, did
18  you inherit any property from her estate?
19    A  Well, on her demise any assets that she
20  may have had in her trust flowed into my trust.
21    Q  Outside of a trust, did you directly
22  receive any property from her estate?
23    A  Other than the Jaguar, no.
24    Q  Other than the Jaguar, okay.
25    A  My sister died, essentially, insolvent.

### Page 39

1    Q  Okay. So did she have any life insurance
2  policies --
3    A  No, ma'am.
4    Q  -- where you would be the beneficiary?
5    A  No, nothing in force. There was one that
6  she had failed to pay on it.
7    Q  Okay.
8    A  And so there was nothing in force.
9    Q  Okay. I understand.
10       Have you ever owned any property in
11  Nebraska?
12    A  No, ma'am.
13    Q  Have you ever owned any interest in a
14  business entity that would own property in Nebraska?
15    A  No, ma'am.
16    Q  Have you ever owned any mineral rights?
17    A  No, ma'am.
18    Q  Do you have any ownership interest in any
19  other business entity, other than Integrated Global
20  Solutions, Inc.?
21    A  No, ma'am.
22    Q  Are you currently employed?
23    A  No, ma'am.
24    Q  What is your educational background?
25    A  I have a BA in advertising, from San Jose

### Page 40

1  State.
2    Q  Okay. And you said you're currently
3  seeking employment?
4    A  I'm looking for employment.
5    Q  Okay. And is there a particular area of
6  employment that you're looking at?
7    A  Given the current market, I'm looking for
8  something in sales.
9    Q  Okay.
10    A  Given the current economy.
11    Q  Real estate sales or?
12    A  I do not carry a Florida broker's
13  license, so it will not be in real estate sales.
14    Q  Okay. So when you were previously in
15  real estate sales it was in Texas?
16    A  That's correct.
17    Q  Okay. Do you have any future interest in
18  any real or personal property?
19       MR. FINNER: Same objection. You may
20     answer.
21       THE WITNESS: Not to the best of my
22     knowledge, no, ma'am.
23  BY MS. SAFI:
24    Q  Okay. Are you entitled to interest in
25  Texas real property at a future date in time?

### Page 41

1  A   I am not, no.
2  Q   You are not?
3  A   I am not.
4  Q   Okay. Is one of the trust entities
5  entitled to future interest in property at some
6  future date in time?
7       MR. FINNER: Same objection. You may
8       answer.
9       THE WITNESS: As I stated earlier, the
10      testamentary trust owns the home in McAllen,
11      Texas, where my dad's wife has a life estate.
12 BY MS. SAFI:
13 Q   Okay. So, upon her passing, the trust,
14 then, will have complete interest in the Texas home?
15 A   That's my understanding.
16 Q   Okay.
17 A   I think they have -- that's my
18 understanding.
19 Q   Okay. On Schedule F, Ms. Kelso was
20 questioning you earlier concerning your credit
21 cards. Were you receiving demand letters or phone
22 calls from Asset Acceptance prior to the filing of
23 bankruptcy?
24 A   I don't know. I was receiving phone
25 calls, but they never identified themselves and I

### Page 42

1  did not return the phone calls.
2  Q   When did you close the Capital One card,
3  the first one listed here, the 4121, last ending
4  0782?
5  A   As I sit here today, I don't know a
6  specific date.
7  Q   Approximately, was it this year?
8  A   No, ma'am. It was somewhere in the 2001,
9  2002 time frame, to the best of my knowledge, I
10 don't know specifically. It was not this year.
11 Q   Is that the same thing with regard to the
12 account ending 4224? The next Capital One Services
13 account, I'm sorry.
14 A   Yes, ma'am, approximately.
15 Q   Okay. To the next page, the Chase card,
16 when was that account closed?
17 A   Again, approximately at the beginning of
18 this decade.
19 Q   Okay. And is it the same thing with the
20 Citicard and the Providian National Bank card?
21 A   Yes, ma'am.
22 Q   Are you currently married?
23 A   No, ma'am.
24 Q   Is anyone else living at the Ponte Vedra
25 property?

### Page 43

1  A   Yes, ma'am.
2  Q   And is that person contributing to rent?
3  A   No, ma'am.
4  Q   Why is that?
5  A   She is unemployed.
6  Q   Does she have any source of income?
7  A   She does, yes.
8  Q   And what is that?
9  A   She works for her brother and, basically,
10 she is an automobile broker and goes to the auction
11 and buys and sells. Well, she has had employment.
12 She has had some income and employment, as a
13 personal assistant, so she does odd jobs.
14 Q   How long has she been out of a 40 hour
15 work week?
16 A   Since I've known her. She's just done
17 odd jobs to get some spare money here and there.
18 Q   And she's been at that property for six
19 months as well?
20 A   Yes, ma'am.
21 Q   Okay. Do you know how much income she is
22 bringing in a month?
23 A   I'll tell you, this last month it was
24 zero.
25 Q   How about last month?

### Page 44

1  A   Zero.
2  Q   How about for the year?
3  A   I do not know.
4  Q   Does she contribute at all to any
5  household expenses?
6  A   No, ma'am.
7  Q   So are you supporting her?
8  A   She pays her own credit card bill, things
9  of that nature. I pay the rent. Basically she pays
10 for any expenses she had when we met and I pay for
11 the rent, the food, the lights. If she needs
12 anything personal that's at her expense.
13 Q   Are there any other persons living there
14 with you?
15 A   No, ma'am.
16 Q   Do you have any children?
17 A   I do.
18 Q   And how many children do you have?
19 A   I have one beautiful daughter.
20 Q   One daughter?
21 A   Yes, ma'am.
22 Q   And how old is she?
23 A   She is 19.
24 Q   Is she in college?
25 A   She is.

Page 45

1  Q  Okay. And who's supporting your
2  daughter?
3  A  Her mother.
4  Q  Do you pay any child support or any kind
5  of college tuition?
6  A  No, ma'am.
7  Q  I'm almost finished --
8  A  You're doing fine.
9  Q  -- just to let you know.
10    Under Schedule J, the current
11  expenditures, on the second page, under other
12  expenditures, it talks about a rental car for $850.
13  Is that still an expenditure?
14  A  No, ma'am.
15  Q  Okay. So you no longer had to rent a car
16  after the Tahoe was returned?
17  A  That is correct.
18  Q  Okay. So do you intend to amend these
19  schedules to change the rental car expense? Well,
20  given the fact that the total expenditures are now
21  increased by $850 a month.
22    MR. FINNER: The bankruptcy code requires
23    the filing of schedules and statements which
24    reflect the financial condition of the debtor
25    as of the date of filing.

Page 46

1    MS. SAFI: I understand, thank you.
2  BY MS. SAFI:
3  Q  You stated on the statement of financial
4  affairs, I just want to make sure I understand this,
5  under Question 1, that there was no income in the
6  year of 2009. Mr. Schultz, I just wanted an
7  explanation from you as to why that is.
8    MR. FINNER: Same objection. You may
9    answer.
10    THE WITNESS: Well, given the economy,
11    I've not been able to find employment.
12  BY MS. SAFI:
13  Q  I understand that, but why is it that you
14  don't consider $4500 a month from the irrevocable
15  trust to be income?
16    MR. FINNER: I'm going to assert the same
17    objection and go on to state that what
18    Mr. Schultz considers something to be and what
19    the law requires, in terms of reporting things
20    on bankruptcy schedules and statements, may not
21    be the same thing.
22    With your -- if you understand the
23    question and can answer it anyway, you may
24    answer.
25    THE WITNESS: Well, I think that's the

Page 47

1  answer I would give.
2  BY MS. SAFI:
3  Q  Do you own any artwork?
4  A  No, ma'am. Well, yes, ma'am, I do.
5  Q  What do you own?
6  A  I do own artwork, yes, ma'am.
7  Q  Okay.
8  A  And I put that in the schedule, I
9  believe.
10  Q  Okay.
11  A  I don't know if you would call it
12  artwork, but I would call it some starving artist
13  work.
14  Q  Okay. Do you own any artwork that has
15  any substantial value?
16  A  No, ma'am, I do not, and that's what I
17  thought you meant when you asked the question.
18  Q  Okay. Do you know if you have any future
19  interest in artwork that has substantial value?
20    MR. FINNER: Same objection.
21    You may answer.
22    THE WITNESS: Not to the best of my
23    knowledge, no, ma'am.
24    MS. SAFI: Okay.
25    MS. KELSO: I'm going to need to --

Page 48

1    MS. SAFI: Wrap it up?
2    MS. KELSO: Yeah, and I have one more
3    question too.
4    MS. SAFI: Okay. If you could give me
5    just two seconds, Ms. Kelso, just let me look
6    just real fast.
7    MS. KELSO: Okay. And while she's doing
8    that, what do you intend -- how do you intend
9    to reorganize during the course of the Chapter
10    11 case?
11    THE WITNESS: Well, I have no income. I
12    have these debts that I'm not able to pay and
13    so what I'm doing is just reducing my overhead
14    as best I can and trying to find employment and
15    bring in some income. It's a pretty difficult
16    situation I'm in.
17    MS. KELSO: And when were you divorced?
18    THE WITNESS: I believe that was
19    finalized on or about June of 2007.
20    MS. KELSO: Okay. And you don't have any
21    obligations for child support?
22    THE WITNESS: No, ma'am, I do not. And
23    my daughter is not an issue of my marriage with
24    Dr. Justice.
25    MS. KELSO: Okay.

*(904) 358-                                                                        Page 49

1      **MS. SAFI:** I'm done.
2      **MS. KELSO:** Do you have anything else?
3      **MS. SAFI:** No.
4      **MS. KELSO:** Okay. I'm going to go
5   ahead -- our office will follow up with you or
6   your attorney.
7      Mr. Finner, if you want to give us that
8   agreement, whatever you need to do, we'll look
9   at it. We want to get the trust agreement and
10  we'll follow up regarding any outstanding
11  documentation that we need, but I'm going to go
12  ahead and conclude the meeting of creditors.
13     **MR. FINNER:** Thank you, Ms. Kelso.
14     **THE WITNESS:** Thank you, Ms. Kelso.
15     **MS. KELSO:** Yes, good luck.
16     **THE WITNESS:** Thank you, Ms. Safi.
17     **MS. SAFI:** Thank you.
       (The proceedings concluded at 11:58 a.m.)
       ANDERSON REPORTING SERVICES, INC.
       (904) 358-0112

Page 50

CERTIFICATE OF REPORTER

I, Rebecca Noel, Court Reporter, do hereby certify that I was authorized to and did report the foregoing proceedings, and that the transcript, pages 1 through 49, is a true and correct record of my stenographic notes.

Dated this 13th day of October, 2009.

_____
Rebecca Noel, Court Reporter

ANDERSON REPORTING SERVICES, INC.
(904) 358-0112